*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | |
|---|---|
| *WILLIAM P. SADULSKY and* | ) |
| *SANDRA SADULSKY,* | ) |
| | ) |
| *Plaintiffs* | ) |
| | ) |
| *v.* | )     *No. 1:14-cv-01-GZS* |
| | ) |
| *TOWN OF WINSLOW, et al.,* | ) |
| | ) |
| *Defendants* | ) |

*RECOMMENDED DECISION ON MOTION FOR PARTIAL SUMMARY JUDGMENT*

In this action stemming from police officers' January 2, 2012, investigation of a noise complaint that resulted in the use of a Taser against the husband plaintiff and his arrest, defendants Town of Winslow ("Town"), Joshua Veilleux, and Michael Michaud move for summary judgment as to all claims against them by plaintiffs William P. Sadulsky ("Mr. Sadulsky") and Sandra Sadulsky ("Mrs. Sadulsky"), and defendant Haley Fleming moves for summary judgment as to Mr. Sadulsky's claims of false arrest/imprisonment and both plaintiffs' claims of trespass/illegal entry. *See* Defendants' Motion for Partial Summary Judgment ("Motion") (ECF No. 40) at 1; Amended Complaint and Demand for Jury Trial ("Amended Complaint") (ECF No. 25) ¶¶ 14-70.

For the reasons that follow, I recommend that the Motion be granted.

## I. Applicable Legal Standards

### A. Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). "A dispute is genuine if 'the

evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *Johnson v. University of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)).  "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson,* 714 F.3d at 52.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (quoting *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006) (emphasis omitted)); Fed. R. Civ. P. 56(c).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B. Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and

supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(f).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id*.; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II.  Factual Background

The parties' statements of material facts, credited to the extent that they are either admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of the plaintiffs as the nonmovants, reveal the following.[1]

### A.  January 2, 2012, Incident

On January 2, 2012, Winslow police officers Fleming and Michaud responded to the plaintiffs' house to investigate a noise complaint from a neighbor.  Defendants' Statement of Material Facts Not in Dispute in Support of Motion for Summary Judgment ("Defendants' SMF") (ECF No. 40-1), attached to Motion, ¶ 10; Plaintiff[s'] Response to Defendants' Statement of Material Facts ("Plaintiffs' Opposing SMF") (ECF No. 49-1), attached to Plaintiffs' Response to Defendants' Motion for Partial Summary Judgment ("Opposition") (ECF No. 49), ¶ 10.[2]

There was a history of complaints to police about Mr. Sadulsky by his neighbors and by Mr. Sadulsky against those neighbors.  *Id.* ¶ 11.  The officers were made aware that Mr. Sadulsky was a problem after their briefing with Veilleux.  Plaintiff[s'] Statement of Material Facts Not in Dispute Against Motion for Summary Judgment ("Plaintiffs' Additional SMF"), commencing on page 4 of Plaintiffs' Opposing SMF, ¶ 14; Defendants' Reply Statement of Material Facts Not in Dispute in Support of Motion for Summary Judgment ("Defendants' Reply SMF") (ECF No. 54-1), attached to Defendants' Reply in Support of Motion for Partial

---

[1] Statements that are qualified are assumed to be admitted subject to that qualification, unless a qualification indicates otherwise.  To the extent that I have incorporated one side's qualification into the statement of the other, I have determined that the qualification is supported by the record citation(s) given.  I have omitted qualifications that are unsupported by the citation(s) given or are redundant.  To the extent that I have taken into consideration a denial of a statement, I have determined that the denial is supported by the citation(s) given.

[2] The plaintiffs qualify this statement, Plaintiffs' Opposing SMF ¶ 10, asserting that Veilleux also responded to the plaintiffs' house, taking a separate police cruiser and arriving after the other officers as backup, Deposition of Lieutenant Joshua Veilleux (ECF No. 34), attached to Stipulated Record (ECF No. 33), Page ID # 230 at 35-37.

Summary Judgment ("Reply") (ECF No. 54), ¶ 14.  The officers were advised to be extremely

wary of Mr. Sadulsky and that they might need to protect themselves.  *Id.*

    Fleming, Michaud, and Veilleux went to Mr. Sadulsky's house in two separate police

cruisers to investigate the noise complaint.  *Id.* ¶ 15.[3]  When Fleming and Michaud arrived in the

first cruiser, there was no noise coming from the residence.  *Id.* ¶ 16.[4]

    Mr. Sadulsky claims that, after speaking with Fleming and Michaud briefly, he invited

them inside his home.  Defendants' SMF ¶ 12; Plaintiffs' Opposing SMF ¶ 12.[5]  The first contact

was made by Fleming, who grabbed Mr. Sadulsky's arm at the front door.  Plaintiffs' Additional

---

[3] I omit the plaintiffs' assertion that Veilleux admits going to "the back side of the garage" after he arrived and being there until he was called on the radio by Fleming, Plaintiffs' Additional SMF ¶ 24, which is neither admitted nor supported by the citation given.

[4] I omit the plaintiffs' assertion that it was a common practice of the Town's officers to drive by when there was no longer any noise following a noise complaint, Plaintiffs' Additional SMF ¶ 17, which is neither admitted nor supported by the citation given.  I also omit the plaintiffs' statements regarding the Town's Noise Control Ordinance ("NCO"), Plaintiffs' Additional SMF ¶¶ 18-19, sustaining the defendants' objection, Defendants' Reply SMF ¶¶ 18-19, that the NCO is irrelevant given Fleming's testimony that he investigated noise complaints as potential criminal disorderly conduct charges, not as civil NCO violations, Deposition of Sergeant Haley Fleming ("Fleming Dep.") (ECF No. 34-1), attached to Stipulated Record, Page ID ## 246-47 at 17-22.  *See also* Plaintiffs' Additional SMF ¶ 23; Defendants' Reply SMF ¶ 23 (Fleming has never once charged a town ordinance violation in his entire career).  The plaintiffs argue that Fleming's choice to investigate all noise complaints as potential criminal charges, rather than under the NCO, reflects the Town's failure to adequately hire, train, manage, and supervise its officers, Opposition at 7-8, was a factor in coercing Mr. Sadulsky's consent to Fleming's entry into his home, *id.* at 12-13, and precipitated Mr. Sadulsky's false imprisonment, *id.* at 19.  However, as discussed below, the plaintiffs fall short of demonstrating that Fleming's decision to investigate the noise complaint as a potential disorderly conduct charge was impermissible or constitutes a basis for liability on any of these three theories.

[5] The plaintiffs qualify this statement, Plaintiffs' Opposing SMF ¶ 12, asserting, in cognizable part, that when Fleming asked if the officers could come in, Mr. Sadulsky initially told him no, and he spoke to the officers through the storm door during the majority of communications at the front door, Deposition of William Sadulsky ("Sadulsky Dep.") (ECF No. 34-3), attached to Stipulated Record, Page ID ## 274-76 at 27-29.  I omit the plaintiffs' citations to caselaw and argument that Mr. Sadulsky's consent was not voluntary, which are neither facts nor appropriate record citations in support of facts.  Loc. R. 56(c), (f).  I also omit the plaintiffs' statement offering a definition by their expert, Melvin Tucker, of the meaning of a "consensual encounter" for law enforcement purposes, Plaintiffs' Additional SMF ¶ 22, sustaining the defendants' objection, Defendants' Reply SMF ¶ 22, that this invades the province of the court, *see, e.g., Nieves-Villanueva v. Soto-Rivera,* 133 F.3d 92, 100 (1st Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.") (citation and internal quotation marks omitted).

SMF ¶ 27; Defendants' Reply SMF ¶ 27.[6] Mr. Sadulsky testified at his deposition that Michaud was not in the house when he was Tased and handcuffed by Fleming.  Defendants' SMF ¶ 13; Sadulsky Dep., Page ID ## 283, 285-86, 289 at 46, 48-49, 52.   Mr. Sadulsky claims that Michaud did not come into the kitchen of his residence until after he had been handcuffed by Fleming.  Defendants' SMF ¶ 14; Sadulsky Dep., Page ID # 289 at 52.  Mr. Sadulsky claims that Fleming alone picked him up off the floor by his arm.  Defendants' SMF ¶ 15; Sadulsky Dep., Page ID # 291 at 54.[7]  Mr. Sadulsky claims that the only physical contact that he had with Michaud was when Michaud walked him from the house to the police cruiser.  Defendants' SMF ¶ 16; Plaintiffs' Opposing SMF ¶ 16.[8]

Mr. Sadulsky testified that Veilleux never had any physical contact with him and was not present when Mr. Sadulsky was Tased or handcuffed by Fleming.  *Id*. ¶¶ 17-18.  Mr. Sadulsky also testified that Veilleux was not in the kitchen when Fleming pulled him up by his arm. Defendants' SMF ¶ 19; Sadulsky Dep., Page ID ## 291-92 at 54-55.[9]

---

[6] The defendants qualify this statement, Defendants' Reply SMF ¶ 27, asserting that Fleming testified that he grabbed Mr. Sadulsky's finger to deflect it after Mr. Sadulsky thrust it toward Fleming's face, Fleming Dep., Page ID # 251 at 36-37.

[7] The plaintiffs purport to deny Defendants' SMF ¶¶ 13-15, citing Mr. Sadulsky's testimony during a September 20, 2012, criminal trial on charges of assaulting Michaud and Fleming, as well as Michaud's testimony during the 2012 criminal trial and during a deposition taken in connection with this case, Plaintiffs' Opposing SMF ¶¶ 13-15. However, the criminal trial testimony of Mr. Sadulsky on which the plaintiffs rely is consistent with, rather than contradicting, the deposition testimony on which the defendants rely.   Trial Proceedings ("Criminal Trial Transcript") (ECF No. 35), attached to Stipulated Record, Page ID # 358 at 200.  Michaud did indicate that he observed Fleming Tase Mr. Sadulsky and assisted Fleming in handcuffing him and standing him up.  Deposition of Officer Michael Michaud ("Michaud Dep.") (ECF No. 33-5), attached to Stipulated Record, Page ID ## 203-05 at 40-43, 45-47; Criminal Trial Transcript, Page ID # 348 at 115.  However, this does not contradict the defendants' statements as to what *Mr. Sadulsky* claims happened.

[8] The plaintiffs qualify this statement, Plaintiffs' Opposing SMF ¶ 16, asserting that the underlying facts are contested based on Michaud's testimony at the criminal trial and during deposition, Michaud Dep., Page ID # 205 at 45-46; Criminal Trial Transcript, Page ID # 348 at 115.

[9] I omit the defendants' further assertion that Mr. Sadulsky testified that Michaud was not in the kitchen at that time, Defendants' SMF ¶ 19, which the plaintiffs deny, Plaintiffs' Opposing SMF ¶ 19, viewing the evidence in the light most favorable to the plaintiffs as nonmovants.   The defendants object that the plaintiffs cannot impeach Mr. Sadulsky's deposition testimony with his own prior inconsistent statements during his criminal trial.  Reply at 1-2.  However, they cite no authority for this proposition.   *Id*.  Hence, the objection is overruled.

Fleming stated in his deposition that he didn't say anything to Mr. Sadulsky and gave no warnings the first time the Taser was deployed.  Plaintiffs' Additional SMF ¶ 7; Defendants' Reply SMF ¶ 7.[10]  According to the Taser download report produced by the defendants, on January 2, 2012, at or about 9:14 p.m., the Taser discharged four times in the course of 16 seconds.  *Id.* ¶ 25.

Mrs. Sadulsky testified that she had not seen Michaud while her husband was being Tased and handcuffed by Fleming.  Defendants' SMF ¶ 20; Plaintiffs' Opposing SMF ¶ 20.[11]  She also testified that Veilleux arrived on the scene after Mr. Sadulsky was handcuffed, that Veilleux did not enter the kitchen, and that Michaud and Veilleux "[d]idn't do anything."  *Id.* ¶¶ 21-23.

Mrs. Sadulsky is closely related to Mr. Sadulsky, as she is his wife.  Plaintiffs' Additional SMF ¶ 29; Defendants' Reply SMF ¶ 29.  She stated that "right after [the incident] happened, I went to the bathroom and got sick and did other things which I won't say."  *Id.* ¶ 30.  She elaborated later that she also had gastrointestinal distress and "couldn't think straight worried about her husband's health and safety."  *Id.*  She clarifies that Dr. Michael Lambke prescribed Trazedone in June 2012 to help her sleep.  *Id.* ¶ 31.  The stress of the January 2, 2012, incident and her concern over her husband were making it difficult for her to sleep.  *Id.*[12]

---

[10] The defendants qualify this statement, admitting that Fleming did not say anything to Mr. Sadulsky to warn him in the moments immediately preceding the deployment of the Taser but asserting that Fleming testified that he spoke to Mr. Sadulsky upon arriving at the residence and that, although he could not say exactly when he yelled at the plaintiff to "get on the ground," that was what he would have been saying throughout the altercation, Fleming Dep., Page ID ## 249-51, 254 at 28-36, 49-50.  I omit the plaintiffs' assertion that, when their counsel explained to Veilleux at deposition the circumstances immediately before the Taser was fired by Fleming, Veilleux testified that, given those facts, it would not have been appropriate to use the Taser, Plaintiffs' Additional SMF ¶ 8, sustaining the defendants' objection, Defendants' Reply SMF ¶ 8, that it is not supported by the citation given.

[11] The plaintiffs qualify this statement, Plaintiffs' Opposing SMF ¶ 20, asserting that Mrs. Sadulsky testified that Michaud arrived while Mr. Sadulsky was on the floor with Fleming, Deposition of Sandra Sadulsky (ECF No. 34-4), attached to Stipulated Record, Page ID # 304 at 12.

[12] The defendants qualify this statement, Defendants' Reply SMF ¶ 31, asserting that the affidavit cited in support of paragraph 31 indicates that Mrs. Sadulsky was stressed not only about the January 2, 2012, incident but also about (*continued on next page*)

Mr. Sadulsky was convicted of assaulting Michaud.  Defendants' SMF ¶ 24; Plaintiffs'

Opposing SMF ¶ 24.  He was found not guilty at his criminal trial of a physical assault against

Fleming.  Plaintiffs' Additional SMF ¶ 28; Defendants' Reply SMF ¶ 28.

### B.  Manner of Moving Handcuffed Person from Sitting to Standing

Melvin Tucker, the plaintiffs' expert, states that Maine law enforcement officers are

taught in basic training at the Maine Criminal Justice Academy how to move a handcuffed

person to his feet from a sitting position.  *Id.* ¶ 21.  To get a person standing again after being

handcuffed and prone with his hands behind his back is safely accomplished by rolling the

subject onto his side into a seated position, having the subject pull either leg toward him, and

then rolling the subject onto his knees to a standing position.  Plaintiffs' Additional SMF ¶ 21;

Affidavit of Melvin L. Tucker ("Tucker Aff.") (commencing on page 6 of ECF No. 49-2),

attached to Plaintiffs' Opposing SMF, Page ID # 512, ¶¶ 11-12, & Appx. I (ECF No. 49-3)

thereto.[13]

---

Mr. Sadulsky's then-upcoming criminal trial, Affidavit of Sandra Sadulsky (commencing on page 11 of ECF No. 49-4), attached to Plaintiffs' Opposing SMF, Page ID # 542, ¶ 8.  I omit the defendants' assertion that Mrs. Sadulsky is taking a prescription sleep aid drug and an antidepressant that she has been taking since prior to January 2, 2012, Defendants' SMF ¶ 25, which the plaintiffs deny, Plaintiffs' Opposing SMF ¶ 25, viewing the evidence in the light most favorable to the plaintiffs as nonmovants.

[13] The defendants' objection to paragraph 21 for lack of any foundation for Tucker's stated knowledge as to how officers are trained at the Maine Criminal Justice Academy and for failure to identify or authenticate the photographs attached as Appendix I to his affidavit, Defendants' Reply SMF ¶ 21, is overruled.  "When the adequacy of the foundation for . . . expert testimony is at issue, the law favors vigorous cross-examination over exclusion."  *Zuckerman v. Coastal Camps, Inc.,* 716 F. Supp.2d 23, 28 (D. Me. 2010) (citation and internal quotation marks omitted).  "If the factual underpinnings of the expert's opinions are in fact weak, that is a matter affecting the weight and credibility of [the expert's] testimony."  *Id.* (citation and internal punctuation omitted).  "It is only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury that such testimony must be excluded on foundational grounds."  *Id.*  Tucker's *curriculum vitae* indicates that he was an adjunct professor of criminal justice at the University of Maine at Augusta from 2000 to 2004 and has provided criminal justice training at the Maine Criminal Justice Academy.  *See* Appx. A (commencing on page 11 of ECF No. 49-2) to Tucker Aff., Page ID ## 515, 520-21.  This is a sufficient foundation to withstand the exclusion of the opinion.  With respect to Appendix I, Tucker identifies the procedure depicted in the photographs as that taught in basic training at the Maine Criminal Justice Academy.  Tucker Aff., Page ID # 512, ¶¶ 11-12.  The defendants deny the second sentence of paragraph 21, Defendants' Reply SMF ¶ 21; however, I view the evidence in the light most favorable to the plaintiffs as nonmovants.

Mr. Sadulsky testified at the criminal trial that he had rotator cuff surgery and still, in the fall of 2012, had pain there.  Plaintiffs' Additional SMF ¶ 26; Defendants' Reply SMF ¶ 26.[14]

## C.  Town's Use of Force, Electronic Weapons Policies

As of January 2, 2012, the Town of Winslow Police Department had policies in effect governing the use of Electronic Control Weapons ("Electronic Weapons Policy") and the Situational Use of Force ("Use of Force Policy").  Defendants' SMF ¶¶ 3-4; Plaintiffs' Opposing SMF ¶¶ 3-4.[15]

The Use of Force Policy is based on a "situational use" model rather than a "force continuum" model and may differ from those of other police departments.  Plaintiffs' Additional SMF ¶ 1; Defendants' Reply SMF ¶ 1.[16]  The policy contains, in an appendix, a chart titled "Situational Use of Force Options," listing an officer's options with respect to individuals in four categories: (i) resistive, (ii) assaultive/high risk, (iii) cooperative, and (iv) life threatening – serious bodily injury.  Plaintiffs' Additional SMF ¶ 2; Use of Force Policy, Page ID # 185, Appx.

---

[14] I omit the plaintiffs' further statement that, after reviewing MRI results prior to surgery, Dr. Michael Curran found that Mr. Sadulsky's rotator cuff had significant change consistent with a partial tear and stated that Mr. Sadulsky's "shoulder problems came as a result of the twisting injury to his arm" and that this injury "most likely . . . caused his current shoulder symptoms going by the standard of more likely than not."  Plaintiffs' Additional SMF ¶ 20.  I sustain the defendants' objection, Defendants' Reply SMF ¶ 20, that this is inadmissible hearsay in the form offered (a copy of a medical record).  I have considered whether the record might be admissible pursuant to the hearsay exception for records of a regularly conducted activity, Fed. R. Evid. 803(6); however, the plaintiffs have not offered the requisite certification, see Fed. R. Evid. 803(6)(D).

[15] I omit the defendants' assertion, Defendants' SMF ¶ 5, that the plaintiffs do not claim that either the Electronic Weapons Policy or Use of Force Policy is unconstitutional.  While the statement is supported by the defendants' citations to the plaintiffs' interrogatory responses, Plaintiff's Answers to Interrogatories Propounded Upon Plaintiff (ECF No. 38), attached to Stipulated Record, Page ID ## 428-29 at 6-7; Plaintiff's Supplemental Responses to Interrogatories (ECF No. 37), attached to Stipulated Record, Page ID ## 417-21 at 1-5, it is apparent that the plaintiffs do now make such a claim, Plaintiffs' Opposing SMF ¶ 5; Opposition at 2-5.

[16] My recitation incorporates the defendants' qualification.  I omit the plaintiffs' further assertion, Plaintiffs' Additional SMF ¶ 1, that the Use of Force Policy contains no escalation of force procedure, which is not a fair characterization of the policy.  As the defendants point out, Defendants' Reply SMF ¶ 1, the policy provides, in relevant part, that "an officer's responsibility is to use only that amount of force that reasonably appears necessary to effect an arrest, control a situation, or to defend the officer or a third party from harm[,]" Use of Force Policy (ECF No. 33-4), attached to Stipulated Record, Page ID # 171 at 1.

# 2.[17]  Verbal and non-verbal options are listed only with respective to cooperative individuals.

Plaintiffs' Additional SMF ¶ 3; Use of Force Policy, Page ID # 185, Appx. # 2.[18]

> The Use of Force Policy defines a "Situational Use of Force" as:
>
> A dynamic process by which a[n] officer assesses, plans, and responds to situations that threaten public and officer safety.  The assessment process begins with the situation immediately confronting the officer, and moves to the suspect's behavior and the officer's perceptions and tactical considerations.  Based on this assessment, the officer selects from the available response options while continuing to evaluate the evolving situation and adapt a plan and actions that are reasonable and effective for the particular situation.

Plaintiffs' Additional SMF ¶ 4; Defendants' Reply SMF ¶ 4.[19]

The Electronic Weapons Policy does state, under reporting requirements, that an officer must document "the circumstances leading to the ECW [Electronic Control Weapons] use, including the failure or apparent futility of trying lower-level compliance options," but it does not define those options within that section of the policy.  *Id.* ¶ 6.[20]

---

[17] I omit the plaintiffs' further assertion that the chart does not distinguish less aggressive first option responses from more aggressive control options, Plaintiffs' Additional SMF ¶ 2, sustaining the defendants' objection that this is not a fair characterization, Defendants' Reply SMF ¶ 2.  Options listed for an individual whose actions are life-threatening (firearms, impacting vital areas) are more aggressive than those for a cooperative individual (professional presence, control, handcuff and search, verbal, and nonverbal).  Use of Force Policy, Page ID # 185, Appx. # 2.  It is not apparent, merely from the face of the chart, that the listed options within each category are set forth in no particular order, rather than from least aggressive to most aggressive.  *Id.*

[18] The defendants deny this, Defendants' Reply SMF ¶ 3; however, it is an accurate statement regarding the chart.  The defendants' assertions are in the nature of a qualification: that the chart does not foreclose a lesser use of force than those listed under various categories, and that the policy as a whole makes clear that the force used must be the least amount necessary given the situation.  Use of Force Policy, Page ID ## 171-80 at 1-10.

[19] My recitation incorporates the defendants' qualification.  I omit the plaintiffs' further assertion, Plaintiffs' Additional SMF ¶ 5, that the definition of "Situational Use of Force" is not "consistent" between the Use of Force and Electronic Weapons policies.  As the defendants point out, Defendants' Reply SMF ¶ 5, the wording differences between the policies are not substantive, *compare* Use of Force Policy, Page ID # 174 at 4 *with* Electronic Weapons Policy (ECF No. 33-3), attached to Stipulated Record, Page ID # 166 at [3].

[20] My recitation incorporates the defendants' qualification.  As the defendants point out, Defendants' Reply SMF ¶ 6, the Electronic Weapons Policy elsewhere addresses officers' options, stating that "it is the policy of this agency that an officer may use [ECW] as an option in the Situational Use of Force" and defining the terms "Officer Response Options" and "Situational Use-of-Force Options[,]" Electronic Weapons Policy, Page ID ## 164-66 at [1]-[3].

Prior to January 2, 2012, the Town had not received any complaints of unreasonable or excessive force used by Winslow police officers Veilleux, Fleming, or Michaud.  Defendants' SMF ¶ 8; Plaintiffs' Opposing SMF ¶ 8.[21]

Mr. Sadulsky claims that the Town "created a custom of the officers at [the] department treating the Plaintiff differently in their encounters with him than other citizens, fostering a police culture or policy that violated Plaintiff's clearly established constitutional rights . . . ."  *Id.* ¶ 6.[22]

### D.  Town's Liability Coverage

The Town and its employees have liability coverage provided by the Town's membership in the Maine Municipal Association Property & Casualty Pool ("Pool"), a self-insured municipal risk pool.  *Id.* ¶ 1.  Under the Pool agreement:

> Coverage is limited to those areas for which governmental immunity has been expressly waived by 14 M.R.S.A. 8104-A, as limited by 14 M.R.S.A. 8104-B, and 14 M.R.S.A. 8111. . . .  Liability coverage shall not be deemed a waiver of any immunities or limitation of damages available under the Maine Tort Claims Act, other Maine statutory law, judicial precedent, or common law.

*Id.* ¶ 2.

### E.  Town's Taser Training

Pursuant to the Use of Force and Electronic Weapons policies, "Only law enforcement officers who have successfully completed this agency's approved training shall be authorized to carry and use an Electronic Weapon."  Plaintiffs' Additional SMF ¶ 12; Defendants' Reply SMF

---

[21] The plaintiffs purport to qualify this statement, Plaintiffs' Opposing SMF ¶ 8, but fail to do so, offering only an argument that they do not know if the defendants' statement is accurate or complete.  I omit the plaintiffs' statement that, according to manufacturers' reports, more than 40 suspects have died after being subject to ECW deployment, Plaintiffs' Additional SMF ¶ 13, which is neither admitted nor supported by the citation given.

[22] I omit the defendants' statement that Mr. Sadulsky testified that he had no interactions with police giving rise to any constitutional violations other than those that allegedly occurred on January 2, 2012, Defendants' SMF ¶ 7, which is neither admitted nor supported by the citation given.

¶ 12.  Fleming received training and certification in the use of Tasers in 2008.  Defendants' SMF ¶ 9; Plaintiffs' Opposing SMF ¶ 9.

It has been a long-standing practice in the law enforcement profession to require officers to stay proficient on the lethal and non-lethal weapons they carry (baton, pepper-spray, firearm, Taser).  Plaintiffs' Additional SMF ¶ 10; Defendants' Reply SMF ¶ 10.  It was a well-established training standard in 2012 that the training provided to officers on the Taser should, at a minimum, be consistent with the manufacturer's recommendations.  *Id.* ¶ 11.[23]  Taser states in its official materials that "certification is valid for a period of one year" and that "[u]sers should re-qualify once each year."  *Id.* ¶ 9.[24]

### III.  Discussion

Mr. Sadulsky sues all four defendants (i) pursuant to 42 U.S.C. § 1983 for violation of his constitutional rights to be free from illegal entries, searches, and seizures, alleging that the individual officers illegally entered his residence, assaulted him, used excessive force to detain him, and arrested him, and the Town permitted those violations (Count I), (ii) for actual or

---

[23] The defendants object that the plaintiffs' expert, Tucker, merely parrots language from a 2005 Training Key published by the International Association of Chiefs of Police, which is hearsay and without foundation as to its application to police officers in the State of Maine in 2012, and that Tucker lacks any demonstrable foundation for opining on training standards in Maine in 2012, having last worked as a police officer himself 17 years before this incident in other states.  Defendants' Reply SMF ¶ 11.  It is not clear that Tucker merely parrots the 2005 Training Key.  While he cites it and appends it to his affidavit, Tucker Aff., Page ID # 511, ¶ 7 & Appx. J (commencing on page 1 of ECF No. 49-4) thereto, he avers that his opinions "are premised upon my experience as a law enforcement officer, my education and training in law enforcement, my knowledge of law enforcement standards, [and] analysis and study in the field, through consulting professional literature and the facts of this case as determined by a comprehensive review of the materials listed in Appendix C[,]" Tucker Aff., Page ID # 511, ¶ 3.  On the other hand, it is not clear that Tucker's reliance on the 2005 Training Key passes muster pursuant to Federal Rule of Evidence 703.  *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").  The plaintiffs do not argue, or point to evidence, that the 2005 Training Key contains facts or data on which experts in Tucker's field would reasonably rely in forming an opinion on the subject at issue.  I need not rule on the objection because, for reasons discussed below, even if the challenged opinion is taken into account, it is not outcome-determinative.

[24] My recitation incorporates the defendants' qualification.  The defendants' objection to this statement on the ground that it is irrelevant, Defendants' Reply SMF ¶ 9, is overruled in view of my decision to take into account, for purposes of summary judgment, the Tucker opinion set forth in Plaintiffs' Additional SMF ¶ 11.

attempted intentional interference by physical force, threat of physical force, and trespass on his property with his constitutional rights, in violation of the Maine Civil Rights Act ("MCRA"), 5 M.R.S.A. § 4682 (Count II), (iii) for assault/excessive force (Count III), and (iv) for false imprisonment (Count IV).  *See* Amended Complaint ¶¶ 43-61.  Mr. and Mrs. Sadulsky sue Fleming, Michaud, and Veilleux for trespass/illegal entry (Count V).  *See id*. ¶¶ 62-65.[25]  Finally, Mrs. Sadulsky sues all four defendants for negligent infliction of emotional distress ("NIED") (Count VI).  *See id*. ¶¶ 66-69.

The Town seeks summary judgment as to Counts I and II on the basis that Mr. Sadulsky fails to demonstrate the existence of an unconstitutional policy or custom or any deliberate indifference that directly caused a deprivation of his civil rights, and as to Counts III, IV, V, and VI on the basis that the Town has absolute immunity from those claims pursuant to the Maine Tort Claims Act ("MTCA").  *See* Motion at 3-8.  All four defendants seek summary judgment as to any claims of unconstitutional entry or common-law trespass (Counts I and V) on the basis that Mr. and Mrs. Sadulsky fail to make out a triable issue of such a violation or tort.  *See id*. at 8-9.  Michaud and Veilleux seek summary judgment as to all excessive force and assault claims against them (Counts I, II, and III) on the ground that Mr. Sadulsky's own testimony establishes that neither of them used excessive force against him or could be liable for failing to prevent the alleged use of excessive force by Fleming.  *See id*. at 9-11.  All four defendants seek summary judgment as to Mr. Sadulsky's illegal arrest/false imprisonment claims (Counts I and IV) on the basis that they cannot be liable as a matter of law in view of Mr. Sadulsky's state-court conviction for assaulting Michaud.  *See id*. at 11.  Finally, the Town, Michaud, and Veilleux seek

---

[25] The defendants construe Count V to state a claim for trespass/illegal entry against the Town as well as the individual officers.  *See* Motion at 7-8.  To the extent that the plaintiffs press this claim against the Town, for the reasons discussed below, I agree with the defendants that the Town is entitled to summary judgment with respect to it.

summary judgment as to Mrs. Sadulsky's NIED claim (Count VI) on the grounds that she fails even to allege a breach of a duty of care toward her husband and does not demonstrate that she suffered severe emotional distress.  *See id.* at 11-12; Amended Complaint ¶¶ 67-69.[26]

For the reasons that follow, I recommend that the Motion be granted.

## A.  Town: Section 1983, MCRA Claims (Counts I, II)

Local governments may be held liable under 42 U.S.C. § 1983 if they cause a person to be subjected to a constitutional deprivation.  *See, e.g., Connick v. Thompson,* 131 S. Ct. 1350, 1359 (2011).  However, they "are responsible only for their *own* illegal acts" and "are not vicariously liable under § 1983 for their employees' actions."  *Id.* (citations and internal quotation marks omitted) (emphasis in original).[27]

"[A] plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal 'policy' or a 'custom' that caused the plaintiff's injury."  *Silva v. Worden,* 130 F.3d 26, 30-31 (1st Cir. 1997) (citations and internal quotation marks omitted).  "The disputed 'policy' or 'custom' must also be the cause and moving force behind the deprivation of constitutional rights." *Id.* at 31 (citation omitted).

The term "policy" encompasses "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the governmental] body's officers."  *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 690 (1978).  In addition, local governments "may be

---

[26] Although the defendants appear to argue for summary judgment in favor of all four defendants on the NIED claim, *see* Motion at 11-12, they state in both the opening and closing paragraphs of their motion, *see id.* at 1, 13, and in their reply brief, *see* Reply at 1, that they seek summary judgment in favor of Fleming only as to the plaintiffs' illegal entry and false imprisonment claims.  That is consistent with their representation in their Local Rule 56(h) filing that they intended to seek summary judgment in favor of Fleming only as to those two claims.  *See* ECF No. 28 at 1-2.  Thus, I construe the Motion to seek summary judgment in Fleming's favor only as to the illegal entry and false imprisonment claims.

[27] As the defendants observe, *see* Motion at 3 n.1, "[t]he disposition of a 42 U.S.C. § 1983 claim also controls a claim under the MCRA[,]" *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007).  *See also, e.g., Connors v. Town of Brunswick*, No. 99-331-P-C, 2000 WL 1175641, at *8 n.15 (D. Me. Aug. 16, 2000) (rec. dec., *aff'd* Oct. 16, 2000) (section 1983 municipal liability analysis is properly applied to MCRA claim).

sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id*. at 690-91.

Municipal liability for a "custom" attaches when "the relevant practice is so widespread as to have the force of law." *Silva*, 130 F.3d at 31 (citation and internal quotation marks omitted). "[O]ne method of showing custom is to demonstrate that the custom or practice is so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Id*. (citation and internal quotation marks omitted).

The plaintiffs set forth four theories for holding the Town liable pursuant to section 1983 and the MCRA:

1.      The Town's Use of Force and Electronic Weapons policies are facially unconstitutional. *See* Opposition at 2-5. The Use of Force Policy does not clarify where the Taser falls on the use of force continuum, leaving it to an officer's discretion, with little guidance, when and whether to use it. *See id.* at 3. While the Electronics Weapons Policy does require reporting of the failure or apparent futility of trying lower level options, it fails to define those options. *See id*. at 4-5. These shortcomings led Fleming to deploy his Taser without shouting a warning or using a non-verbal threat to gain control of the situation. *See id*. at 4.

2.      The Town requires only initial Taser training and certification, omitting any requirement for ongoing training and recertification. *See id*. at 5-6. As of January 2, 2012, it had been almost four years since Fleming had been certified on the use of a Taser and three years since he had possessed an active certification. *See id*. at 6. The Town knew or should have known that it lacked a policy that its officers be recertified annually in Taser use, in

contravention of the 2005 Training Key attached to the plaintiffs' expert's affidavit. *See id.* at 6-7.

3.    Given that the noise had abated upon officers' arrival, as a result of which they could have simply driven by the residence, they dealt with Mr. Sadulsky in an unnecessarily confrontational way; for example, warning him that he could face criminal charges if the noise were to continue even though the Town's Noise Control Ordinance does not provide for criminal sanctions. *See id.* at 7-8.

4.    Fleming used a method to lift Mr. Sadulsky to his feet that deviates significantly from the procedure that he was trained to use when assisting handcuffed individuals to stand, injuring Mr. Sadulsky's shoulder. *See id.* at 8-10.[28]

With respect to the first theory, as the defendants rejoin, *see* Reply at 3, the fact that the Town's use of force model differs from those of other municipalities does not tend to show that its policy was unconstitutional.   The plaintiffs rely on citation to *Russell v. Wright*, 916 F. Supp.2d 629, 633-34 (W.D. Va. 2013), for the proposition that the clarity of the municipal policy at issue in that case "helped the town succeed in its request for Summary Judgment as to excessive force" in that, consistent with that policy, the officer repeatedly shouted for the suspect to get down before deploying a Taser. *See* Opposition at 4.   Yet, as the defendants point out, *see* Reply at 3, the court in *Wright* considered whether the *officer's* use of force was objectively reasonable, not whether the municipality could be held liable, *see Wright*, 916 F. Supp.2d at 634-

---

[28] The plaintiffs appear to have abandoned their claim that the Town "created a custom of the officers at [the] department treating [Mr. Sadulsky] differently in their encounters with him than other citizens, fostering a police culture or policy that violated Plaintiff's clearly established constitutional rights . . . ."   Defendants' SMF ¶ 6; Plaintiffs' Opposing SMF ¶ 6.   To the extent that they still proceed on that theory, it is unavailing in that it is unsupported by any evidence of interactions between Mr. Sadulsky and the Town apart from the incident of January 2, 2012. *See, e.g., Bennett v. City of Biddeford*, 364 F. Supp.2d 1, 3 (D. Me. 2005) ("Absent evidence of an unconstitutional municipal policy, a single incident of misconduct cannot provide the basis for municipal liability under § 1983.") (citations and internal quotation marks omitted).

44. Nothing in *Wright* suggests that a policy must be the same or similar to that described therein to pass muster. Indeed, in holding that the officer's use of a Taser in *Wright* did not violate clearly established law, the court observed that the law on the reasonableness of the deployment of Tasers was evolving, and that "[l]ocal law enforcement policies . . . reflect differing views of where the taser fits on the 'force continuum[,]" with some "allow[ing] taser use only as an alternative to deadly force, while others call for taser use whenever any force is justified." *Id*. at 644.

The fact that the Use of Force and Electronic Weapons policies do not mandate that an officer first give warnings or attempt less aggressive methods of control before deploying a Taser does not render them facially unconstitutional. The Use of Force Policy expressly states that an officer "is to use only that amount of force that reasonably appears necessary to effect an arrest, control a situation, or to defend the officer or a third party from harm[,]" Use of Force Policy, Page ID # 171 at 1, and the Electronic Weapons Policy requires documentation of "[t]he circumstances leading to the ECW use, including the failure or apparent futility of trying lower-level compliance options[,]" "[a]ny verbal commands given, [and] the suspect's response," and "why the ECW was selected instead of other less severe force options[,]" Electronic Weapons Policy, Page ID # 168 at [5]. The policies, at a minimum, imply that officer should use the least amount of force reasonably necessary, including resorting to lower-level compliance techniques, if feasible, before resorting to the use of a Taser.

Finally, to the extent that the plaintiffs argue that Mr. Sadulsky was Tased when he was fully cooperative, *see* Opposition at 5, the Use of Force and Electronic Weapons policies cannot fairly be read to condone the use of a Taser as a first option with respect to a cooperative

individual.  The Situational Use of Force Appendix does not even list electronic weapons as an option for use on a cooperative subject.  Use of Force Policy, Page ID # 185, Appx. # 2.

With respect to the second theory – an alleged failure to require adequate Taser training and recertification – the Supreme Court has cautioned that municipal liability is "at its most tenuous" where failure-to-train claims are concerned.  *Connick,* 131 S. Ct. at 1359.  For such a claim to succeed, a plaintiff must establish that the "municipality's failure to train its employees in a relevant respect . . . amount[s] to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  *Id*. (citation and internal quotation marks omitted).  Deliberate indifference requires the municipal actor to "disregard[] a known or obvious consequence of his action[.]"  *Id*. at 1360 (citation and internal quotation marks omitted).  Thus, liability only arises when municipal "policymakers are on actual or constructive notice that a particular omission in their training program causes . . . employees to violate citizens' constitutional rights[.]"  *Id.*

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train."  *Id.* (citation and internal quotation marks omitted).  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Id*.  A single constitutional violation supports a claim for failure to train only where the violation of constitutional rights is a "highly predictable consequence" of that failure.  *Id.* at 1361 (citation and internal quotation marks omitted).

The plaintiffs fall short of demonstrating the existence of a triable issue with respect to this stringent standard.  They offer Tucker's opinion that it was a well-established training

standard in 2012 that training provided to officers on the Taser should be consistent with the manufacturer's recommendations, and that the manufacturer of the Taser recommended that users should requalify annually in the Taser's use. *See* Plaintiffs' Additional SMF ¶¶ 9-11; Defendants' Reply SMF ¶¶ 9-11. However, this opinion, standing alone, does not establish that failing to implement the manufacturer's recommendation would be tantamount to ignoring an obvious risk of constitutional violations. This is particularly so in that, as the defendants point out, *see* Reply at 4, the plaintiffs acknowledge that the State of Maine does not mandate annual training and recertification in Taser use, *see* Opposition at 7.[29] The plaintiffs do not explain how, in these circumstances, the Town ignored a known or obvious consequence of the omission of any such training requirement.

It is undisputed that, prior to January 2, 2012, the Town had not received any complaints of unreasonable or excessive force used by Veilleux, Fleming, or Michaud. *See* Defendants' SMF ¶ 8; Plaintiffs' Opposing SMF ¶ 8. In the absence of any evidence that, before January 2, 2012, the Town had ever been placed on notice of any complaints or problems with its officers' Taser use, the plaintiffs fall short of raising a triable issue that the Town's failure to mandate annual training in Taser use amounted to deliberate indifference to the rights of persons with whom its officers would come into contact. *See, e.g., Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 667 F. Supp.2d 1276, 1292-93 (M.D. Ala. 2009), *rev'd on other grounds*, 639 F.3d 1041 (11th Cir. 2011) (plaintiff failed to demonstrate that city's failure to mandate annual retraining in Taser use exposed city to section 1983 liability when there was no pattern of

---

[29] The State of Maine requires law enforcement agencies to adopt written policies regarding procedures to deal with "[u]se of physical force, including the use of electronic weapons[,]" and directs the Maine Criminal Justice Academy Board of Trustees ("Board") to "establish minimum standards for each law enforcement policy[.]" 25 M.R.S.A. § 2803-B(1)(A) & (2). The State of Maine also mandates that, "[a]s a condition to the continued employment of a person as a law enforcement officer[,]" an individual "must successfully complete in-service training as prescribed by the [B]oard." *Id.* § 2804-E(1).

constitutional violations and the likelihood of such violations in the absence of annual Taser retraining was not so great as to be obvious; noting that use of a Taser was not presumptively the use of deadly force, and city did require initial Taser training and certification).

The plaintiffs' third and fourth theories also fall flat.  As the defendants point out, *see* Reply at 4-5 n.1, it is undisputed that Fleming was not seeking to enforce the Noise Control Ordinance but, rather, to investigate a potential criminal charge of disorderly conduct.  The plaintiffs argue that his choice to do so – rather than to abort the investigation because the noise had abated or to proceed pursuant to the civil ordinance – unnecessarily escalated tensions on the night in question. *See* Opposition at 7-8.  However, even taking into account Fleming's testimony that he always investigated noise complaints as potential disorderly conduct charges rather than as civil violations, the plaintiffs do not explain how this reflected an unconstitutional *Town* policy or custom or failure to train.  *See id.*  Moreover, to the extent that they contend that the manner in which Fleming investigated the noise complaint was the product of a failure to train, they make no showing that the Town was deliberately indifferent to its citizens' constitutional rights, either because it ignored a pattern of constitutional violations stemming from the manner in which its officers investigated noise complaints or because the alleged violation of Mr. Sadulsky's rights was a highly predictable consequence of its failure to train with respect to such investigations.

With respect to the fourth theory, as the defendants point out, *see* Reply at 4-5 n.1, the plaintiffs complain that Fleming brought Mr. Sadulsky to his feet *in contravention of* his training, rather than as the result of a municipal policy or custom or failure to train, *see* Opposition at 8-10.

The Town, accordingly, is entitled to summary judgment as to the plaintiffs' section 1983 and MCRA claims (Counts I and II).[30]

## B.  Town: Tort Claims (Counts III through VI)

Pursuant to the MTCA, a governmental entity is immune from suit "on any and all tort claims seeking recovery of damages[,]" 14 M.R.S.A. § 8103(1), with several enumerated exceptions, *id*. §§ 8104-A, 8116.  Those exceptions pertain to tort claims arising out of:

1.    ownership, maintenance, or use of vehicles, machinery, and equipment, *id*. § 8104-A(1);

2.    negligent construction, operation, or maintenance of any public building, *id*. § 8104-A(2);

3.    discharge of pollutants, *id*. § 8104-A(3);

4.    road construction, street cleaning, or repair, *id*. § 8104-A(4); and

5.    areas in which the governmental entity would otherwise be immune but for which it has obtained liability insurance coverage, *id*. § 8116.

In this case, the only possible exception to immunity is the final one; however, the plaintiffs do not dispute that the Town's liability insurance specifically excludes coverage for any cause of action seeking tort damages for which the Town is otherwise immune under the MTCA.  *See* Defendants' SMF ¶¶ 1-2; Plaintiffs' Opposing SMF ¶¶ 1-2.

The Town, accordingly is entitled to summary judgment as to all state-law tort claims asserted in Counts III through VI.

_____

[30] To the extent that the plaintiffs allege constitutional violations pursuant to section 1983 or the MCRA in Counts III through V, this recommended disposition applies to those claims, as well.

### C.  All Defendants: Trespass/Illegal Entry Claims (Counts I, V)

The defendants seek summary judgment as to the plaintiffs' claims of trespass/illegal entry (Counts I, V) on the basis that officers investigating a complaint do not commit a Fourth Amendment constitutional violation or common-law trespass when they approach a residence and knock on the door or when they enter a residence at the invitation of an occupant with authority.  *See* Motion at 8-9.

For purposes of both the Fourth Amendment and common-law trespass, "a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do."  *Florida v. Jardines*, 133 S. Ct. 1409, 1416 (2013) (citation and internal quotation marks omitted); *see also State v. Cloutier*, 544 A.2d 1277, 1279-80 & n.3 (Me. 1988), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990) (For purposes of both the Fourth Amendment and common-law trespass, "the walkway immediately outside the door of [an individual's] residence[] is the normal route of access for anyone visiting the premises.  As such, it is only a semi-private area, admitting of a reasonable expectation that various members of society may use the walkway in the course of attending to personal or business pursuits with persons residing in the home, including police officers on police business.").

In addition, for purposes of both the Fourth Amendment and common-law trespass, an officer may enter a residence at the invitation of an occupant with authority to extend the invitation.  *See, e.g.*, *Patterson v. North Carolina*, No. 5:12-cv-182-RJC, 2015 WL 163249, at *4-*5 (W.D.N.C. Jan. 13, 2015) ("The Fourth Amendment's prohibition on warrantless entry into a person's home does not apply when voluntary consent to enter is obtained either from the person whose property is searched or from someone, such as a spouse, with actual or apparent

22

authority over the premises.") (citations omitted); *Collomy v. School Admin. Dist. No. 55,* 1998

ME 79, ¶ 6, 710 A.2d 893, 895 ("A trespasser is defined as a person who enters or remains upon

land in the possession of another without a privilege to do so created by the possessor's consent

or otherwise.") (citations and internal quotation marks omitted).

Fleming and Michaud committed neither a Fourth Amendment violation nor a trespass

when they approached the plaintiffs' door, knocked, and requested admittance for the purpose of

investigating a neighbor's noise complaint.

The plaintiffs concede that Mr. Sadulsky invited Fleming into their residence, but

contend that he was coerced to do so. *See* Opposition at 10-14. They add that Mr. Sadulsky

never consented to Michaud's entry and that Veilleux trespassed by going to "the back side of

the garage" without a warrant, probable cause, exigent circumstances, or an invitation to be

there. *See id*. at 12, 14.

As the First Circuit has noted:

Consent is voluntary if it is the product of an essentially free and unconstrained
choice. In determining voluntariness, the focus is often on whether the
individual's will has been overborne and his capacity for self-determination
critically impaired.

Determining whether an individual's consent was indeed voluntary or instead the
product of coercion requires a highly fact-specific inquiry dependent upon a
careful scrutiny of the totality of the circumstances, rather than on a mechanical
application of legal factors to a factual scenario. The common list of relevant fact
drivers for assessing whether consent was voluntary includes the person's age,
education, experience, knowledge of the right to withhold consent, and evidence
of coercive tactics. While there is no requirement that the person who gave
consent must have been explicitly advised of the right to withhold it, valid consent
requires more than mere acquiescence in the face of an unfounded claim of
present lawful authority.

*United States v. Brake*, 666 F.3d 800, 806 (1st Cir. 2011) (citations and internal quotation marks omitted).  "In a section 1983 civil action, the burden of proving involuntary consent rests on the plaintiff."  *Patterson*, 2015 WL 163249, at *5.

The plaintiffs argue that there is a triable issue as to whether Mr. Sadulsky's consent was voluntary because, although he made clear at the outset of the encounter that he did not wish to invite the officers in, his will was overborne by police tactics that included illuminating the front of his house with cruiser floodlights, threatening possible criminal action for a simple noise complaint, and failing to take seriously his complaint of gunshots the previous evening at his neighbor's residence.  *See* Opposition at 11-12.

Nonetheless, as the defendants rejoin, "Nothing in the record supports Mr. Sadulsky's after-the-fact argument that he was coerced into asking the officers to enter his home so that he could show the officers information related to the noise complaints he had made about his neighbors."  Reply at 5.

The only relevant cognizable evidence of record is the defendants' statement that Mr. Sadulsky claims that he invited the officers inside his home, as qualified by the plaintiffs' assertion that Mr. Sadulsky initially told the officers that they could not come inside and spoke to them through the storm door during the majority of communications at the front door.  *See* Defendant's SMF ¶ 12; Plaintiffs' Opposing SMF ¶ 12.  As noted above, the remainder of the plaintiffs' qualification of Defendant's SMF ¶ 12 is legal argument, and I have omitted the plaintiffs' statement that Veilleux admitted going to "the back side of the garage" after he arrived and being there until he was called on the radio by Fleming, Plaintiffs' Additional SMF ¶ 24, because it is neither admitted nor supported by the citation given.

Additional facts on which the plaintiffs rely are set forth only in their brief, *compare* Opposition at 11-12 *with* Plaintiffs' Additional SMF, warranting their disregard, *see, e.g., Sea Hunters, LP v. S.S. Port Nicholson*, No. 2:08-cv-272-GZS, 2015 WL 1206487, at *6 n.3 (D. Me. Mar. 17, 2015) ("This court previously has declined to consider facts that are strewn throughout the body of a brief rather than presented as required by Local Rule 56.  I do the same here.  This rule transgression deprives the movant of the opportunity to admit, deny, or qualify the nonmovant's statements, and the court of the benefit of the movant's response.") (citation omitted).

The defendants, accordingly, are entitled to summary judgment with respect to all trespass/illegal entry claims against them (Counts I and V).[31]

### D.  Michaud and Veilleux: Excessive Force, Assault Claims (Counts I through III)

Michaud and Veilleux seek summary judgment as to all excessive force/assault claims against them, Counts I through III, on the basis that Mr. Sadulsky's own testimony establishes that they could not be liable for using excessive force against him, assaulting him, or failing to intercede to prevent the use of excessive force against him (so-called "bystander liability").  *See* Motion at 9-11.[32]

They note that Mr. Sadulsky testified that (i) neither Michaud nor Veilleux was present when Fleming Tased and handcuffed him, (ii) neither was in the kitchen when Fleming stood him up by his arm, (iii) the only physical contact that he had with Michaud was when Michaud

---

[31] To the extent that Mr. Sadulsky asserts trespass/illegal entry claims in Count II, this recommended disposition applies to those claims, as well.

[32] In analyzing whether summary judgment should be entered in favor of Veilleux and Michaud as to Counts I through III, both sides rely on section 1983 analysis.  *See* Motion at 9-11; Opposition at 14-18.  The disposition of the section 1983 claim (Count I) not only controls the MCRA claim (Count II) but also informs the MTCA claim (Count III), in that "[t]he MTCA's immunity defense covers officers' discretionary conduct unless that conduct was so egregious as to clearly exceed any discretion the officers could have possessed under the circumstances." *Berube*, 506 F.3d at 85 (citation and internal quotation marks omitted).

walked him from the house to the cruiser after his arrest, and (iv) he had no physical contact with Veilleux. *See id*. at 10-11.

The plaintiffs dispute that Mr. Sadulsky's testimony at deposition is controlling. *See* Opposition at 15. They assert that Michaud testified that he witnessed Fleming Tase Mr. Sadulsky, handcuff him, and haul him to his feet and actually assisted Fleming in hauling Mr. Sadulsky to his feet. *See id*. at 15-17. They add that Mrs. Sadulsky testified that Veilleux was present when Fleming pulled Mr. Sadulsky to his feet. *See id.* at 17.

The defendants rejoin that any attempt to use Michaud's testimony to impeach that of Mr. Sadulsky is unavailing in that:

1.    At best, the plaintiffs could establish that the officers were negligent in the manner in which they picked Mr. Sadulsky up from the floor, in which case the officers would be entitled to discretionary function immunity pursuant to the MTCA, 14 M.R.S.A. § 8111(c). *See* Reply at 6.

2.    Even if Michaud or Veilleux was present when Mr. Sadulsky was Tased, the Taser discharged four times in 16 seconds. *See id*. at 7.

3.    There is no record evidence that either Michaud or Veilleux actually saw the alleged use of excessive force or had a realistic opportunity to prevent it. *See id*.

I agree that the cognizable evidence does not suffice to raise a triable issue as to Veilleux's or Michaud's liability on Counts I through III.

There is no evidence that Veilleux participated in or even observed the Tasing of Mr. Sadulsky. The plaintiffs assert that Mrs. Sadulsky testified that Veilleux was present when Fleming pulled Mr. Sadulsky to his feet, *see* Opposition at 17; however, this fact is mentioned

only in their brief, *compare id. with* Plaintiffs' Additional SMF, warranting its disregard, *see, e.g., Sea Hunters*, 2015 WL 1206487, at *6 n.3.

In similar vein, while the plaintiffs allude to the Michaud testimony in the context of denying or qualifying the defendants' statements, *compare* Opposition at 15-17 *with* Plaintiffs' Opposing SMF ¶¶ 13-16, 19, they set forth the precise statements on which they rely solely in their brief, *compare* Opposition at 15-17 *with* Plaintiffs' Additional SMF, warranting their disregard, *see, e.g., Sea Hunters*, 2015 WL 1206487, at *6 n.3.

Michaud and Veilleux, accordingly, are entitled to summary judgment as to Mr. Sadulsky's assault and excessive force claims (Counts I through III).

### E.  All Defendants: False Arrest/Imprisonment Claims (Counts I, IV)

The defendants next seek summary judgment as to Mr. Sadulsky's claims of false arrest and imprisonment on the basis that, because Mr. Sadulsky was tried and convicted of assaulting Michaud on January 2, 2012, such claims cannot lie.  *See* Motion at 11.  The plaintiffs contend that there are disputed issues of fact concerning the basis for arrest and the officers' legal justification for being in the residence in the first place.  *See* Opposition at 20.

As the defendants argue, *see* Motion at 11; Reply at 7, the existence of probable cause for an arrest is a complete defense to a claim of false imprisonment, whether asserted pursuant to section 1983 or state law, *see, e.g., Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (claim of false arrest or false imprisonment pursuant to section 1983); *Nasca v. Sgro*, __ N.Y.S.3d __, 2015 N.Y. Slip Op. 05650, 2015 WL 3971346, at *2 (N.Y. App. Div. July 1, 2015) (claim of false arrest or false imprisonment, whether brought pursuant to state law or section 1983); *Cuadrado v. Bristol Police Dep't*, No. CV145015961, 2015 WL 2458187, at *2 (Conn. Super. Ct. Apr. 28, 2015) (claim of false arrest, whether brought pursuant to state law or section 1983).

27

*See also, e.g., Vigeant v. United States*, 245 Fed. Appx. 23, 24 (1st Cir. 2007) ("To establish a claim for false arrest, false imprisonment or malicious prosecution under Rhode Island law, [the plaintiff] was required to demonstrate, among other things, a lack of probable cause for the criminal proceedings.").

There is no dispute that Mr. Sadulsky was convicted of assaulting Michaud.  *See* Defendants' SMF ¶ 24; Plaintiffs' Opposing SMF ¶ 24.  Hence, there was probable cause for his arrest, notwithstanding the fact that he was acquitted of assaulting Fleming.  *See* Plaintiffs' Additional SMF ¶ 28; Defendants' Reply SMF ¶ 28.[33]

The defendants, accordingly, are entitled to summary judgment as to Mr. Sadulsky's claims of false arrest and imprisonment (Counts I and IV).[34]

## F.  Town, Michaud, and Veilleux: NIED Claim (Count VI)

The Town, Michaud, and Veilleux finally seek summary judgment as to Mrs. Sadulsky's NIED claim on the bases that she fails to allege, or provide record evidence, that they breached a duty of care toward her husband and, in any event, it is clear from her testimony that she has not suffered "severe" emotional distress.  *See* Motion at 11-12; Reply at 7.[35]  I conclude that, on the first basis, summary judgment is warranted.

The Law Court has "recognized that the victim of negligent conduct has a legally protected interest in her psychic health, with different rules governing recovery depending on whether she is characterized as a 'direct' or an 'indirect' victim." *Champagne v. Mid-Maine*

---

[33] Assuming *arguendo* that Mr. Sadulsky could assert a claim for false arrest or imprisonment for conduct occurring during the period of time prior to the development of probable cause to arrest him, he does not succeed, for the reasons discussed above, in demonstrating that there is a triable issue as to the propriety of the officers' decision to approach his residence to investigate a neighbor's noise complaint or to enter his residence.

[34] To the extent that Mr. Sadulsky asserts claims of false arrest/imprisonment in Count II, this recommended disposition applies to those claims, as well.

[35] The defendants also argue that even if they acted negligently, they would still be immune from liability pursuant to the MTCA.  *See* Reply at 7.  However, because this argument was first raised in their reply brief, I do not consider it.  *See, e.g., In re One Bancorp Sec. Litig.*, 134 F.R.D. 4, 10 n.5 (D. Me. 1991).

*Med. Ctr*., 1998 ME 87, ¶ 6, 711 A.2d 842, 844.  "A plaintiff is a direct victim if she was the object of the defendant's negligent conduct." *Id.* "In contrast, a plaintiff is an indirect victim if the claimed negligence underlying the NIED claim was directed not at her, but instead at someone she loved and to whom she was close." *Id*. ¶ 6, 711 A.2d at 844-45.

"[F]or a bystander to recover for emotional distress proximately caused by a defendant's negligence toward another person, the bystander must demonstrate that she was present at the scene of the accident; that she suffered serious mental distress as a result of contemporaneously perceiving the accident; and that she was closely related to the victim." *Carter v. Williams*, 2002 ME 50, ¶ 17, 792 A.2d 1093, 1098-99 (Me. 2002) (citation and internal quotation marks omitted).

"All actions sounding in negligence, including NIED, require a plaintiff to establish by a preponderance of the evidence that a defendant's negligent conduct was a proximate cause of her injuries." *Champagne*, 1998 ME 87, ¶ 10, 711 A.2d at 845.  This entails a showing of "(1) a duty of care owed to [Mr. Sadulsky]; (2) a breach of that duty; (3) an injury; and (4) causation, that is, a finding that the breach of the duty of care was a cause of the injury." *Bell ex rel. Bell v. Dawson*, 2013 ME 108, ¶ 17, 82 A.3d 827, 831-32.  "'Duty' in this case refers to whether the [officers] were under any obligation for the benefit of [Mr. Sadulsky]." *Id*. ¶ 17, 82 A.3d at 832 (citation and internal quotation marks omitted).

The plaintiffs detail why they believe Mrs. Sadulsky meets the three "bystander" criteria; however, with respect to the threshold predicate – that her distress was caused by negligence toward her husband – they merely argue, "The jury at trial could easily find the officers' behavior that night was at a minimum negligent towards Mr. Sadulsky, if not reckless or intentional, and was the proximate cause of Mrs. Sadulsky's emotional distress thereafter."

Opposition at 23. They add that "[t]he duty of care owed by the officers falls under the bystander liability rubric referenced in <u>Carter</u>, which a jury could find at trial with Plaintiffs' facts." *Id*. However, that rubric concerns the three specific showings that a bystander must make, not the predicate showing of negligence toward a third person. *See Carter*, 2002 ME 50, ¶ 17, 792 A.2d at 1098-99.

As the defendants suggest, *see* Reply at 7, this is insufficient to stave off summary judgment. The plaintiffs neither cite pertinent authority for the proposition that the officers owed Mr. Sadulsky a duty of care nor explain how the evidence supports their theory of the existence and breach of that duty. The Town, Michaud, and Veilleux, accordingly, are entitled to summary judgment as to Mrs. Sadulsky's NIED claim (Count VI).

## IV. Conclusion

For the foregoing reasons, I recommend that the court ***GRANT*** the defendants' motion for partial summary judgment and enter judgment for the Town, Veilleux, and Michaud as to all claims against them (Counts I through VI) and for Fleming as to Mr. Sadulsky's claims of false arrest/false imprisonment (Count IV, and to the extent incorporated in Counts I and II) and both plaintiffs' claims of trespass/illegal entry (Count VI, and to the extent incorporated in Counts I and II). If the court agrees, remaining for trial will be Mr. Sadulsky's excessive force/assault claims against Fleming pursuant to Counts I, II, and III, and Mrs. Sadulsky's NIED claim against Fleming pursuant to Count VI.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.   A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 5th day of August, 2015.

<u>/s/  John H. Rich III</u>
John H. Rich III
United States Magistrate Judge